[Crim. No. 614. In Bank.—November 28, 1900.]

THE PEOPLE, Respondent, v. OLIVER EMERSON, Appellant.

CRIMINAL LAW — HOMICIDE — SELF-DEFENSE — SUPPORT OF VERDICT.—A verdict of conviction of murder in the first degree cannot be disturbed upon appeal by reason of evidence of self-defense and of the absence of a deliberate intent to take life, where the evidence which bears against the defendant, considered by itself and without regard to conflicting evidence for the defendant, tends to support the verdict.

ID.—INSTRUCTION AS TO SELF-DEFENSE — FEAR OF PRESENT DANGER— APPEARANCES. — The following instruction is correct: "A bare fear that a man's life or limb is in danger is not sufficient to justify a homicide, but in order to justify a man in taking the life of another in self-defense, the circumstances must be sufficient to excite the fears of a reasonable man, and the party killing must have acted under the influence of such fears alone. The danger must be present, apparent, and imminent, and the killing must be done under a well-grounded belief that it was necessary for the defendant to kill the deceased at that time to save himself from great bodily harm." Such instruction is not inconsistent with correct instructions immediately following as to the right of the defendant to act upon appearances, whether the danger was real or only apparent.

ID.—EVIDENCE OF ACTUAL DANGER—DOCTRINE OF APPARENT DANGER.— Where the only danger proved in the case is an actual danger, it is not important to impress the jury with the doctrine that an apparent danger may be such as to justify a killing.

ID.—PLEA OF NOT GUILTY—IMPEACHMENT OF RECORD—ANNOUNCEMENT OF COUNSEL.—After the jury is impaneled and sworn to try a plea of "not guilty," entered upon the record, as the plea of the defendant, he cannot be permitted to impeach the record by proof that the plea was announced by his counsel, and not by himself. If he stood mute, the entry of such plea was proper.

ID.—EVIDENCE—CALLING OF WITNESS TO PLACE OF DEATH—CONTRADICTION
BY WITNESS — REBUTTAL — REPETITION OF TESTIMONY — HARMLESS
RULING.—Where the prosecution had proved in chief that the son
of the deceased, after the shooting, called a witness to the
place where his father lay dead, and such witness testified for
the defendant that he was called by the son before the shoot-
ing, though it may have been a technical error to permit a
witness for the prosecution merely to repeat in rebuttal his tes-
timony in chief that the calling took place after the shooting,
the ruling permitting it was harmless. It was material to the
people's case to rebut the evidence of the witness for the de-
fendant.

'APPEAL from a judgment of the Superior Court of Tu-
olumne County and from an order denying a new trial. G. W.
Nicol, Judge.

The facts are stated in the opinion of the court.

W. S. Barnes, and J. B. Curtin, for Appellant.

Tirey L. Ford, Attorney General, and A. A. Moore, Jr.,
Deputy Attorney General, for Respondent.

BEATTY, C. J.—Appellant was convicted of murder in the
first degree and sentenced to death. His appeal is from the
judgment and from an order denying his motion for a new trial.

The principal ground of the appeal is that the verdict is
contrary to law and the evidence, and upon this point counsel
contend that all the evidence—that introduced by the prose-
cution no less than the evidence of the defendant himself—
shows clearly and without conflict that the killing (which is
admitted) was done in necessary self-defense, or at least un-
der circumstances which negative the existence of any delib-
erate purpose on the part of the defendant to take the life of
the person slain. Necessarily, this contention as to the absence
of any conflict in the evidence must be made good in order to
sustain the appeal upon the ground stated; for if the evidence
which bears against the defendant, considered by itself, and
without regard to conflicting evidence, is sufficient to support
the verdict, the question ceases to be one of law—of which
alone this court has jurisdiction—and becomes one of fact
upon which the decision of the jury and the trial court is final
and conclusive.

The circumstances of the homicide, as detailed by the witnesses for the prosecution, were substantially as follows: The defendant was the owner of a ranch which he had leased to Joseph Rodgers, reserving to himself a right to occupy, for living purposes, a certain portion of the premises. Rodgers, with his wife and eight children—the oldest eighteen, the youngest four years of age—entered into the possession of the ranch and ranch-house in December, 1898, but defendant continued to occupy one bedroom in the dwelling-house, and a room in an outhouse which he used as a kitchen. Very soon after this joint occupancy of the premises commenced, serious differences arose between the defendant and Rodgers and his family, the original cause of which seems to have been a dispute as to the right of defendant to retain for his own use the bedroom in the house. What the merits of this quarrel were does not appear, but it evidently produced a very bitter antagonism between the parties, and had eventuated in a suit for damages commenced by Rodgers. Things being in this posture on the morning of the 11th of April, 1899, defendant and Rodgers met at the well near the ranch-house. At an earlier hour that morning the defendant had removed the rope and bucket used for drawing water from the well for the purpose, as he says, of mending the bucket, which was out of repair. Leaving the well in that condition, he had gone out to a pasture to look for a cow that he was expecting to calve. On his return he found Rodgers at the well engaged in fitting another rope and bucket for drawing water. What then ensued is told by the wife and three children of Rodgers, who were in the house, but within hearing, when the quarrel commenced, and out at the well before it reached its fatal conclusion. The first words which they distinctly heard were from Rodgers, who said to defendant: "You can't get any more water out of this well; this is the second well you have kept me getting water from." Defendant said he would get water whenever he wanted it. Rodgers said: "I would like to see you come and try to get some now." Defendant said: "I don't want any now; I will get it when I need it." At this point Mrs. Rodgers interjected what I suppose is a quotation from the lease in regard to "water rights and privileges," to which defendant replied: "Yes, for your own use." Then Rod-

gers said again: "You can't get any water here; you have to go to the creek." To which defendant responded by an expression at once contemptuous and unfit to be made in the presence of a woman, whereupon Mrs. Rodgers again interposed with the remark: "That shows how you were raised." Defendant then said: "Where was you raised?" She replied: "I was well raised." Defendant repeated: "Well, where were you raised?" and she again replied: "I was well raised." Then he said: "I have seen you before," and she demanded to know "where." "Well," he said, "I have seen you before you ever came here." With these words the defendant turned to leave, carrying a milk bucket in one hand and a coil of rope in the other—which articles he had held in his hands during the whole colloquy. As defendant moved away from the scene of the quarrel he was followed and apparently overtaken and stopped by Mrs. Rodgers, who demanded again and again to know where he had seen her before. Turning to answer her, he saw before him not only Mrs. Rodgers, but her husband also, who held in his hand a stone as large as he could grasp with one hand, and who, in advancing upon defendant, said: "I want to know what you mean; I want to know where you ever saw her before?" At this instant defendant drew his pistol and commenced firing. His first bullet passed through Rodgers' thigh, who immediately dropped the stone which he carried and turned to run, but before he had moved perceptibly a second bullet entered his head two inches above and one inch behind the left ear, producing a wound which caused almost instant death.

This account of the circumstances immediately surrounding the killing is taken from the testimony of Mrs. Rodgers. It is corroborated and not materially varied by the testimony of three of her children—aged from nine to seventeen years—who arrived upon the scene during the progress of the quarrel between defendant and deceased. The only other material testimony for the prosecution was that of the coroner and autopsy surgeon, who testified to the cause of death, and of a witness who testified that about a week before the homicide he heard defendant say he would "put Rodgers where the dogs would not bark at him."

The only evidence for the defense which it is material to

state in this connection was the testimony of the defendant himself. He recounted the quarrels and the litigation between himself and Rodgers growing out of the leasing and joint occupation of the premises, detailed the facts from which he had inferred an intention on the part of Rodgers to do him some injury, stated that he had been warned that it was necessary to be prepared to defend himself—that he only commenced carrying a pistol in consequence of such warning, and only shot because at the moment he believed his life to be in danger from the attack of Rodgers with the stone which he held in his hand. He gave a version of the quarrel at the well not widely different from that of Mrs. Rodgers and her children, but somewhat more favorable to himself. In particular, he denied the use of the indecent expression attributed to him by Mrs. Rodgers, and stated that he used other words of similar sound, but not at all offensive.

Upon this evidence a jury has found—and the finding has been approved by the trial judge—that the defendant is guilty of murder in its highest grade, and that he deserves to suffer the extreme penalty of the law. We are asked to say, as matter of law, that this verdict is so entirely without support in the evidence that it cannot stand. But after the most careful consideration of the case we do not feel ourselves justified in setting aside the verdict upon this ground. Certainly, the showing against the defendant was not a strong one as to the question of deliberation such as characterizes murder of the first degree. He did not seek or provoke the quarrel which was the immediate cause of the killing. He did not show himself at all aggressive in the course of the altercation, and all the evidence shows that he had turned to leave the scene of the trouble, and would have done so but for the conduct of Rodgers and his wife in following him up and angrily demanding to know where he had seen her before. All this is inconsistent with an intention on the part of the defendant to seek the life of Rodgers at that time, and strongly corroborates his claim that he was only induced to fire by the belief that he was in danger of fatal or serious injury from the threatened attack of Rodgers, armed as he was with a stone, which in the hands of a strong and determined man at close quarters is always a dangerous and often

a deadly weapon. But, on the other hand, the long-standing quarrel and bitter hostility of the parties, the preparation for trouble evidenced by the constant carrying of a loaded pistol, and the threat to put Rodgers "where the dogs would not bark at him," were items of evidence from which the jury might infer a premeditated design to kill, and the fact that the fatal wound was inflicted after the deceased had dropped his weapon, and had turned, or was in the act of turning to run, was evidence which certainly tended to show that defendant was not acting solely with a view of defending himself from death or serious bodily injury.

True, none of these circumstances is at all conclusive, nor are all together. Judging by so much as is disclosed by this record, the quarrel between the parties was not exclusively of defendant's seeking, nor was he particularly active in promoting it. On the contrary, the deceased seems to have been the aggressor. The act of defendant in arming himself may well have been prompted, as he claims it was, solely by fear of violence, of which he had been warned. His threat to put Rodgers "where the dogs would not bark at him" may have been idle and meaningless. His second and fatal shot, fired after Rodgers had dropped his weapon and turned to run, may have been caused by a failure to observe under the excitement of the moment that his adversary was endeavoring to avoid further conflict. But all these matters and their full significance were for the jury to weigh and determine, and their verdict, having substantial evidence to support it, cannot be disturbed unless it is vitiated by some erroneous ruling of the court.

That the trial court did err in its rulings, and particularly in its charge to the jury, is the second ground of the appeal. The appellant claims that the instructions given were contradictory upon a material point, and that the court neglected to give other instructions, which it was its duty to give, and by the omission of which he was seriously prejudiced. The particular matter to which he calls attention in this connection is the use of the following language by the court in charging upon the law of self-defense: "The danger must be present, apparent, and imminent, and the killing must be done under the well-founded belief that it was necessary for the defendant to

kill the deceased at that time to save himself from great bodily harm." It is contended that this part of the charge is in conflict with other instructions which properly state that the danger need not be actual if there is such an appearance of danger as to induce a reasonable man to believe in its actual presence. But, though the language quoted, considered by itself, may imply that the danger must be actual, and that a merely apparent danger will not justify a killing upon the ground of self-defense, yet when it is read with its context as it was given it will bear no such construction. The entire charge upon this point reads as follows: "A bare fear that a man's life or limb is in danger is not sufficient to justify a homicide, but in order to justify a man in taking the life of another in self-defense the circumstances must be sufficient to excite the fears of a reasonable man, and the party killing must have acted under the influence of such fears alone. The danger must be present, apparent, and imminent, and the killing must be done under a well-founded belief that it was necessary for the defendant to kill the deceased at that time, to save himself from great bodily harm. If the defendant believed himself to be threatened with danger, he was justified in determining from appearances and the actual state of things surrounding him as to the necessity of resorting to self-defense, and if he acted from reasonable and honest convictions he cannot be held criminally responsible for a mistake in the actual extent of the danger, when other judicious men would have been alike mistaken. In measuring the danger to himself the defendant was entitled to act upon appearances, and if the appearances were such as to induce in him a reasonable and well-grounded belief that he was actually in danger of losing his life or suffering great bodily harm, he was justified in defending himself, whether the danger was real or only apparent."

This is a correct and very clear statement of the law, and it is further emphasized by several special instructions to the same effect, given at the request of the defendant. And, moreover, this was not a case in which it was important to impress upon the jury the legal doctrine that an apparent danger is sufficient to justify a killing. That doctrine is material and important only in those cases—frequently occurring—where it

turns out that a danger apparently imminent at the time of the killing was in reality nonexistent—as in the case of an assault with an unloaded gun. In this case, the danger, if there was danger to the defendant, was as apparent to the jury as it was to him. What he saw was proven to them, and whatever he had to apprehend they could see was an actual danger. The court did not err in this matter.

It is next objected that the court omitted to give instructions on certain material points. We cannot see that any of these points required further elucidation than they received in the general charge of the court, and some of them were wholly immaterial. No such instruction as the tenth instruction in *People v. Bushton,* 80 Cal. 162, was given, and, therefore, no qualification or explanation of it was called for.

There is nothing in the point that the court erred in proceeding to try the case before issue joined. The record shows that the defendant entered a plea of not guilty at the time of his arraignment. An attempt was made, after the jury had been impaneled and sworn, to impeach the record by proving that in fact the plea of defendant had been announced by his counsel, and not by himself. It was in his presence, however, and was the plea which would have been entered under the direction of the court if the defendant had stood mute. If, when called upon to plead, he did not make the plea announced by his counsel, he did stand mute, and the plea of not guilty was properly entered. If it had been a plea of guilty, there might have been a more serious question about it. As it was, the court very properly refused to hear any testimony to impeach the record.

Finally, it is contended that it was error to allow Elmer Hill to testify in rebuttal that Guy Rodgers called Woods to the scene of the homicide after the shooting. Both Hill and Guy Rodgers had testified to the same thing in chief. For the defense Woods testified that he had been called in by Guy Rodgers before the shooting. It may have been a technical error to allow in rebuttal proof of the same fact that had been made a part of the case in chief, but it could have done no harm to allow one of the witnesses merely to repeat what he had said before. It is further objected to this testimony that it was in-

competent to prove a declaration made by Guy Rodgers not in the presence of the defendant. The so-called declaration of Guy Rodgers was his calling to Woods to come to the place where his father lay dead. This calling was itself the fact to be proven; and if, as contended, it was highly material to defendant's case to show that it occurred before the shooting, it was necessarily material to the people's case to rebut evidence to that effect.

We find no error in the case. The judgment and order of the superior court are affirmed, and the cause remanded for further proceedings upon the judgment.

Van Dyke, J., Harrison, J., McFarland, J., Temple, J., and Garoutte, J., concurred.